IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **JASON DUNSTON** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **BOARDWALK 1000, LLC** | : | |
| d/b/a **HARD ROCK HOTEL AND** | : | |
| **CASINO ATLANTIC CITY** | : | NO. 19-512 |

### MEMORANDUM OPINION

**Savage, J.**                                                                                                                **July 22, 2020**

        Plaintiff Jason Dunston, who was fired from his job as a security supervisor at Defendant Boardwalk 1000, LLC's ("Hard Rock") casino, brought this action for race discrimination, hostile work environment and retaliation. His termination arose out of an incident captured on videotape which shows him placing his hand near an unruly patron's throat and sweeping the patron's legs out from under him. After reviewing the video footage, Hard Rock terminated Dunston for violating its policy against excessive use of force.

        Dunston claims his termination was motivated by his African American race and in retaliation for his complaints of race discrimination. Hard Rock has moved for summary judgment, arguing that the undisputed facts show that Dunston was fired for violating Hard Rock's excessive force policy, not because of discriminatory animus. Dunston counters that he was fired because he was African American, citing a case of disparate treatment of a Caucasian supervisor who had violated the policy and was not disciplined.

        Dunston has introduced evidence to suggest that Hard Rock's proffered legitimate, non-discriminatory reason for his termination is pretext for race discrimination and retaliation. He has not, however, established a *prima facie* case for a claim of hostile work

1

environment. Therefore, we shall deny the motion for summary judgment in part and grant it in part.

## Factual Background[1]

Dunston worked as a security supervisor for Hard Rock from March 2018 until October 18, 2018.[2] He supervised security officers and reported to the shift managers, department manager and department director.[3]

On October 10, 2018, Dunston was called to the casino floor to remove an individual, later identified as Jeffery Megginson, who was panhandling and verbally abusing casino personnel and patrons.[4] There were five security officers at the scene when Dunston arrived.[5] Megginson appeared intoxicated and was acting aggressively.[6] Dunston attempted to de-escalate the situation.[7] Megginson continued to be verbally abusive and vulgar, moving closer to Dunston, spitting in his face, bumping and threatening him.[8] Dunston attempted to push Megginson away by placing his hand near

---

[1] Only objective, undisputed facts are recited here. Dunston's subjective beliefs and opinions are discussed in the Analysis section.

[2] Pl.'s Opp. to Def.'s Mot. for Summ. J. Exh. A at 22:13-16, 23:1-3, 23:10-12 (ECF No. 38) ("Dunston Dep. Tr.").

[3] Pl.'s Opp. Exh. C at 12:5-21 ("Abercrombie Dep. Tr."); Pl.'s Opp. Exh. D. at 25:17-26:9 ("Martin Dep. Tr.").

[4] Dunston Dep. Tr. at 108:3-109:19; Def.'s Mot. for Summ. J. Exh. F at 1, 5 (ECF No. 37).

[5] Dunston Dep. Tr. at 104:25-105:3.

[6] *Id.* at 113:9-16; Pl.'s Opp. Exh. B.

[7] Dunston Dep. Tr. at 106:14-21; Def.'s Mot. for Summ. J. Exh. F at 5.

[8] Dunston Dep. Tr. at 113:24-25, 124:16-21; Def.'s Mot. for Summ. J. Exh. F at 5; Pl.'s Opp. Exh. I.


Megginson's collarbone.[9] He claims he was not aiming for Megginson's throat.[10] Dunston then used his left leg to perform a "leg sweep" that put Megginson on his back on the ground.[11]

Dunston and the other security officers took Megginson to a holding cell in the investigation office where Dunston tried to speak with him.[12] According to Dunston, Megginson held his breath and pretended to pass out.[13] Dunston notified command to contact EMS.[14] The EMS transported Megginson to the hospital where he was found to have no injuries.[15] Megginson was charged with disorderly conduct.[16] He declined to file a complaint against Dunston.[17]

Dunston reported the incident to Stephanie Santiago, one of his shift managers, who reported it to Calvin Abercrombie, the Vice President of Security.[18] An agent from the Division of Gaming Enforcement ("DGE"), who had responded to the scene and was involved in investigating and filing charges against Megginson, advised Abercrombie to

---

[9] Dunston Dep. Tr. at 119:11-17, 196:14-20; Def.'s Mot. for Summ. J. Exh. F at 5.

[10] Dunston Dep. Tr. at 119:18-20, 122:7-10.

[11] *Id.* at 125:15-126:4.

[12] *Id.* at 107:8-9; Pl.'s Opp. Exh. I; Def.'s Mot. for Summ. J. Exh. F at 5.

[13] Pl.'s Opp. Exh. I; Def.'s Mot. for Summ. J. Exh. F at 5.

[14] Pl.'s Opp. Exh. I; Def.'s Mot. for Summ. J. Exh. F at 5.

[15] Pl.'s Opp. Exh. I; Def.'s Mot. for Summ. J. Exh. F at 4-5.

[16] Pl.'s Opp. Exh. B; Def.'s Mot. for Summ. J. Exh. F at 1.

[17] Dunston Dep. Tr. at 136:23-137:1; Pl.'s Opp. Exh. B.

[18] Dunston Dep. Tr. at 88:11-14, 88:19-24, 131:10-12, 131:20-25.

view the video footage.[19] Later that night, after reviewing the footage, Abercrombie placed Dunston on suspension pending investigation.[20]

As part of the investigation, Dunston emailed a statement describing his version of events to James Martin, Hard Rock's employee and labor relations manager.[21] Two security officers who were present at the scene, Brandon Lewis and Jarid Parisi, gave written statements describing Megginson as aggressive and threatening Dunston.[22] Martin forwarded Dunston's email to Abercrombie, who responded: "Unfortunately the sequence of events portrayed in the video does not support his statement or actions."[23]

On October 17, 2018, Martin summoned Dunston to a meeting.[24] Dunston claims he told Martin over the phone that he felt Hard Rock was racially discriminating against him, citing an incident with a Caucasian supervisor who was not disciplined for similar conduct.[25] Martin asked Dunston to send him an email that he could forward to their superiors.[26] Dunston complied, writing:

> In this case I feel I am not being treated fairly. . . . Two days prior to my incident Security Supervisor Hoskins placed a man in a headlock because the male refused to leave the premises after he was ejected. When security was working 12 hour shift [*sic*] with no days off for the opening of the company the same supervisor subdued an intoxicated subject causing injury to the subjects [*sic*] head area thus causing him to go to the hospital

[19] Abercrombie Dep. Tr. at 39:12-40:16; Pl.'s Opp. Exh. B.

[20] Abercrombie Dep. Tr. at 43:1-7; Dunston Dep. Tr. at 138:11-139:1.

[21] Martin Dep. Tr. at 10:14-21, 52:20-22; Pl.'s Opp. Exh. I.

[22] Pl.'s Opp. Exh. I.

[23] Def.'s Mot. for Summ. J. Exh. K at 2.

[24] Dunston Dep. Tr. at 59:13-15, 62:4-6, 145:17-21.

[25] *Id.* at 59:16-17, 147:17-21.

[26] *Id.* at 59:17-19, 147:21-22.

4

> [*sic*] the whole department was aware of this. He was not disciplined for these actions. In fact he was given a promotion that was not posted in house or for non employees. I responded because Security Supervisors Paula and Olmo did not answer their radios like they do on a consistent basis.[27]

He claims he did not use the words "race discrimination" in his email because he had just explained everything to Martin over the phone.[28] Martin denies Dunston ever complained of race discrimination to him.[29]

The following day, Dunston met with Abercrombie, Martin and two other management persons.[30] Abercrombie informed Dunston that he was terminated for violating Hard Rock's policy against the use of excessive force.[31] Matt Hartness, the property president, Frank Chesky, Vice President of Legal Affairs, and Bob Ellis, Vice President of Human Resources, made the decision to terminate Dunston.[32] Abercrombie and Martin agreed with the decision.[33]

Dunston applied for review of his termination by Hard Rock's internal Board of Review.[34] According to Dunston, he did not allege discrimination in his application to the Board of Review because he had been instructed to describe the incident that led to his

---

[27] *Id.* at 59:19; Pl.'s Opp. Exh J.

[28] Dunston Dep. Tr. at 59:23-24, 60:21-61:3, 151:24-152:6.

[29] Martin Dep. Tr. at 75:1-24.

[30] At one point, Dunston testified that he met with Abercrombie, Martin and Larry Kelder, the security department manager. Dunston Dep. Tr. at 213:19-24. Later on, he testified that he met with Abercrombie, Martin and Jerome Samuel. *Id.* at 206:8-11. He did not clarify who Samuel is.

[31] *Id.* at 213:19-214:5; Abercrombie Dep. Tr. at 26:19-21.

[32] Martin Dep. Tr. at 61:19-63:2.

[33] *Id.* at 61:4-62:3, 63:3-9.

[34] Dunston Dep. Tr. at 84:16-20; Abercrombie Dep. Tr. at 45:4-7; Def.'s Mot. for Summ. J. Exh. N.

termination.[35] A panel of Dunston's peers reviewed his termination, including the video footage of the incident, and concluded that termination was appropriate.[36]

## Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts and the weighing of evidence are matters left to the jury. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. FED. R. CIV. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence

---

[35] Dunston Dep. Tr. at 84:24-85:22; Def.'s Mot. for Summ. J. Exh. N.

[36] Dunston Dep. Tr. at 86:10-13; Abercrombie Dep. Tr. at 28:6-12; Def.'s Mot. for Summ. J. Exh. N.

of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

A nonmoving party may defeat summary judgment through the use of depositions. *See* FED. R. CIV. P. 56(c)(1)(A) (a plaintiff may assert that a fact is genuinely disputed by "citing to particular parts of materials on the record, including depositions"); *see also In re CitX Corp.*, 448 F.3d 672, 680 (3d Cir. 2006) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 2722, at 373, 379 (3d ed. 1998)) (observing that depositions are "one of the best forms of evidence for supporting or opposing a summary-judgment motion").

**Analysis**[37]

*Discrimination Based on Disparate Treatment*

Because Dunston is proceeding under a pretext theory, his claims are governed by the burden-shifting *McDonnell Douglas* analysis. Dunston must first establish a *prima*

---

[37] Dunston asserts claims for discrimination, retaliation and hostile work environment under three separate statutes – Title VII, 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination. Claims for discrimination, retaliation and hostile work environment under Section 1981 and NJLAD are evaluated under the same standard as Title VII. *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 256-57 (3d Cir. 2017) (Section 1981 discrimination claims identical to Title VII discrimination claims); *Cortes v. Univ. of Med. & Dentistry of N.J.*, 391 F. Supp. 2d 298, 311 (D.N.J. 2005) (Title VII discrimination analysis applies to NJLAD discrimination claims); *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (Section 1981 and NJLAD retaliation claims identical to Title VII retaliation claims; NJLAD hostile work environment claims analyzed similarly to Title VII hostile work environment claims); *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 826 n.3 (3d Cir. 1994) (Section 1981 hostile work environment claims identical to Title VII hostile work environment claims). Therefore, although our discussion focuses on Title VII, our analysis applies equally to Dunston's claims under Section 1981 and NJLAD.

*facie* case of discrimination based on his race. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Establishing a *prima facie* case of discrimination "is not onerous and poses a burden easily met." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Tex. Dep't of Corr. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

To make out a *prima facie* case, he must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) nonmembers of the protected class were treated more favorably under circumstances giving rise to an inference of unlawful discrimination. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015).

If he succeeds, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). The defendant's burden is "relatively light." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). It can satisfy its burden by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The defendant's burden is one of "production, . . . not of persuasion." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). It "need not prove that the tendered reason *actually* motivated" its decision. *Fuentes*, 32 F.3d at 763 (emphasis in original). It need only show that its decision could have been motivated by the proffered legitimate, non-discriminatory reason. *Id.*; *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

If the defendant satisfies its burden, the plaintiff must produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Makky*, 541 F.3d at 214. The final burden of production "merges with the ultimate burden of persuading [the jury] that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

Hard Rock does not dispute that Dunston is a member of a protected class, he was qualified for his position, and he suffered an adverse employment action. It argues that Dunston's claim fails at the fourth step of the *prima facie* analysis because he has not produced evidence of disparate treatment permitting an inference of race discrimination.[38]

Dunston has presented evidence that a Caucasian security officer who used force was not disciplined; but he, an African American, was. Abercrombie instructed security personnel to read all reports detailing incidents that occurred during their days' off so that they were up to date on who was banned from the property.[39] Dunston reviewed a report of an incident involving Thomas Hoskins, a Caucasian security officer.[40] Two days before the Megginson incident, Hoskins had used force to evict an unruly patron. In the video surveillance footage, Hoskins is seen gripping the patron around the shoulders and evicting him from the property.[41] Dunston argues the video footage shows Hoskins placing the patron in a headlock.[42] Dunston claims he had heard of a similar incident a

---

[38] Def.'s Mot. for Summ. J. at 8.

[39] Dunston Dep. Tr. at 101:19-23.

[40] *Id.* at 101:2-23, 225:16-18.

[41] Pl.'s Opp. Exh. K.

[42] *Id.*; Def.'s Mot. for Summ. J. Exh. A; Abercrombie Dep. Tr. at 35:10-36:2.

9

few months prior where Hoskins took down an elderly, intoxicated patron, causing a head injury that led to the patron's hospitalization.[43] Hard Rock contends Hoskins did not use a chokehold or take the patron to the ground, but rather draped his arms around the patron's shoulders to escort him out.[44] Though Hoskins was investigated for the later incident, his actions were declared lawful and appropriate.[45] At this stage, this evidence of disparate treatment satisfies the fourth element of a *prima facie* case, shifting the burden to Hard Rock.

Hard Rock has produced evidence of a legitimate, non-discriminatory reason for Dunston's termination. Hard Rock policy prohibits security officers' use of "excessive force," which is defined as force "greater than that which is objectively reasonable to obtain lawful objectives under the circumstances presented for each situation."[46] In June 2018, Dunston and several other security officers attended a training on the appropriate use of force.[47] Dunston received an instructor certification from the training.[48]

In video surveillance footage, Dunston appeared to use an unauthorized move by placing his hands near the individual's neck and using a "leg sweep" to bring him to the ground. A DGE agent who reviewed the video footage as part of his investigation into

---

[43] Dunston Dep. Tr. at 224:23-225:1. There is no evidence in the record of this earlier incident, and Dunston offered no explanation for how he learned about it. Abercrombie denied any knowledge of this earlier incident. Abercrombie Dep. Tr. at 58:6-14.

[44] *Id.* at 45:7-15, 56:3-23.

[45] *Id.* at 57:21-24, 58:1-5; Dunston Dep. Tr. at 225:19-22; Martin Dep. Tr. at 73:18-22.

[46] Def.'s Mot. for Summ. J. Exh. D; Abercrombie Dep. Tr. at 22:21-23.

[47] Dunston Dep. Tr. at 94:6-21.

[48] *Id.* at 94:22-95:4, 91:19-92:12.

Megginson suggested to Abercrombie that he look at the footage. Several managers investigated the incident. After reviewing Hard Rock's policies, the surveillance footage and Dunston's statement, they decided to terminate Dunston. The reason for his termination noted in his Personnel Action Form was "[v]iolation of company and department policy with respect to use of force."[49]

Hard Rock having shown a legitimate reason for firing Dunston, the burden shifts back to Dunston to discredit Hard Rock's proffered justification or present evidence that he was fired for a discriminatory reason. *Fuentes*, 32 F.3d at 764. A plaintiff may discredit the proffered reason by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (emphasis removed) (citations and internal quotation marks omitted). A plaintiff can meet his burden by producing evidence from which a factfinder could conclude that the adverse employment action was more likely than not the result of discrimination. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644–45 (3d Cir. 1998); *Fuentes*, 32 F.3d at 764. Examples of such evidence include previous acts of discrimination against the plaintiff, discrimination against other persons within the plaintiff's protected class or within another protected class, or a showing that the defendant has treated similarly situated non-members of the protected class more favorably. *Simpson,* 142 F.3d at 645.

---

[49] Def.'s Mot. for Summ. J. Exh. A.

11

In other words, Dunston must proffer evidence which: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762.

There is a factual dispute about what happened on October 10, 2018. On one hand, Dunston claims Megginson threatened him and posed a danger to him and others, and that he first tried to verbally de-escalate the situation. Dunston testified that he did not grab Megginson by the throat or slam him to the ground, but pushed his "collarbone area" and took him to the ground with the help of the other officers. Two security officers submitted statements corroborating Dunston's characterization of Megginson as aggressive and dangerous. Even Abercrombie admitted that Megginson seemed intoxicated and aggressive, that Megginson "made a threat of physical violence towards Jason and then aggressively walked towards him," and that Megginson bumped into Dunston's chest.[50]

Megginson was not injured or hospitalized. In Dunston's report, he claims Megginson faked breathing difficulties so he would be taken to the hospital.

A DGE agent viewed the encounter differently than Dunston, leading him to bring the incident to Abercrombie's attention and suggest he review the video footage. When asked if he feared that Megginson was armed with a weapon, Dunston responded that it "never crossed my mind."[51] He testified that it was possible that his hand had moved to

---

[50] Abercrombie Dep. Tr. at 40:24-42:2; Pl.'s Opp. Exh. B.

[51] Dunston Dep. Tr. at 105:13-20.

12

Megginson's throat.[52] Abercrombie stated that when he spoke with him after the incident, Dunston admitted that his actions were wrong and he had erred in not using one of the techniques he had been taught in his training.[53] Dunston denied any recollection of this conversation.[54] It is for the jury to determine whether Dunston grabbed Megginson by the throat, whether Megginson was aggressive, whether Dunston used excessive force and whether Dunston's actions were the real reason for his termination.

If proven, the differing treatment of Hoskins for the same conduct permits an inference of race discrimination. Dunston, an African American, was terminated for using force. Hoskins, a Caucasian, was not. It is for the jury to decide whether Hoskins's actions were comparable to Dunston's, whether he was treated more favorably than Dunston and whether this evidence suggests Hard Rock's reason for Dunston's termination is pretextual.

Hard Rock makes much of Dunston's alleged admission that he acted inappropriately. But, that does not mean he was not terminated because of racial bias. If he proves that Caucasians who used excessive force were not terminated or disciplined, he can show disparate treatment. In other words, even if he violated Hard Rock's excessive force policy, he can prove his firing was pretextual because a Caucasian who also violated the policy was not terminated. In that case, a jury could find that his violation of the policy was not the real reason for the employment action.

---

[52] *Id.* at 135:3-136:17.

[53] Pl.'s Opp. Exh. B.

[54] Dunston Dep. Tr. at 137:23-138:10.

*Retaliation*

The *McDonnell Douglas* burden-shifting framework applies to retaliation cases under Title VII. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir. 1997). To establish a *prima facie* case of retaliation, Dunston must demonstrate that: (1) he engaged in a protected activity; (2) his employer took adverse employment action against him after or contemporaneously with his protected activity; and (3) there was a causal connection between his protected activity and the adverse employment action. *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citations omitted).

Hard Rock argues Dunston has not established a *prima facie* case of retaliation because he did not engage in protected activity. Hard Rock claims that Dunston never made a complaint of race discrimination to anyone in management or the human resources or employee relations departments.[55] His emails and submission to the Board of Review make no allegation of race discrimination.[56] He admitted that he never submitted such a written complaint.[57]

Dunston counters that he made multiple verbal complaints of race discrimination to Santiago and Mark McAllister, his other shift manager, regarding his work assignments and treatment by other supervisors.[58] According to Dunston, on October 17, 2018, the

---

[55] Def.'s Mot. for Summ. J. at 13.

[56] Dunston Dep. Tr. at 84:16-85:7.

[57] *Id.* at 85:23-86:9, 150:4-11.

[58] Pl.'s Opp. at 15; Pl.'s Stmt. of Add'l Facts at ¶¶ 67, 69, 75 ("SAF"). Dunston does not identify specific dates that he complained. He testified that he once said to them: "I'm starting to believe that this is really racial. Why am I the only one getting all of this stuff? Is it because I'm the only black supervisor on the shift?" Dunston Dep. Tr. at 73:22-25. He did not describe any other specific statements he made to Santiago or McAllister. He never filed a written complaint of race discrimination with Human Resources or any of his supervisors. *Id.* at 60:1-6, 61:4-7. There is no evidence that either Santiago or McAllister forwarded any complaints of discrimination to the human resources department or others in management.

14

day before he was fired, he explained in detail the race discrimination he had experienced to James Martin.[59] At Martin's instruction, Dunston sent Martin a follow-up email to forward to his superiors in which he specifically referenced Hoskins's disparate treatment.[60] Because he had explained his allegations of discrimination in detail over the phone, Dunston claims, he did not use the word "discrimination" in his follow-up email.[61]

Protected activity includes both formal and informal charges and protests of discriminatory employment practices. *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (quoting *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990)) (internal quotation marks omitted). It is not how the message was conveyed but the message itself that counts. *Id.* Informal verbal complaints are equally sufficient as formal written complaints to constitute protected activity. *See Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006) (police officers' verbal complaints to supervisor regarding discriminatory treatment of African American officers constituted protected activity); *Neiderlander v. Am. Video Glass Co.*, 80 F. App'x 256, 261 (3d Cir. 2003) (plaintiff's informal complaints of sex discrimination to coworkers constituted protected activity if they were communicated to management); *Hashem v. Hunterdon Cty.*, No. 15-8585, 2016 WL 5539590, at *15 (D.N.J. Sept. 29, 2016) (finding plaintiff engaged in protected activity when she verbally complained to her supervisor of race discrimination).

---

[59] Pl.'s SAF at ¶ 110.

[60] *Id.* at ¶¶ 110, 112; Pl.'s Opp. Exh. J.

[61] Pl.'s SAF at ¶ 111.

If Dunston made verbal complaints of race discrimination to Santiago and McAllister, his shift managers, they were protected activity. Dunston testified that he specifically complained to them of race discrimination regarding his assignments and workload relative to other supervisors. Hard Rock does not contradict Dunston's claim that he verbally complained of race discrimination to Santiago and McAllister. It only argues that no complaints were ever "filed."[62]

There is a factual dispute as to whether Dunston complained of race discrimination to James Martin. Dunston's email to Martin on October 17, 2018 only complained of "unfair" treatment compared with the more favorable treatment Hoskins received.[63] However, Dunston testified that in speaking to Martin over the phone before sending the email, he specifically complained of race discrimination.[64] Contradicting him, Martin testified that Dunston never complained to him about being treated differently due to his race.[65] Thus, there is a factual dispute about whether he complained of race discrimination to Martin.

The timing of his termination one day after his alleged verbal complaint to Martin about race discrimination and his follow-up email complaining about unfair treatment in relation to Hoskins raises an inference of causation. *See Daniels*, 776 F.3d at 196 ("To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'") (citations

---

[62] Def.'s Reply at 2 (ECF No. 39).

[63] Dunston Dep. Tr. at 60:21-61:3.

[64] *Id.* at 59:13-19.

[65] Martin Dep. Tr. 67:5-68:14

16

omitted); *see, e.g., Jalil,* 873 F.2d at 708 (discharge of plaintiff two days after filing EEOC complaint sufficient, under the circumstances, to establish causation).

Dunston having shown a *prima facie* case of retaliation, the burden shifts to Hard Rock to show a legitimate, non-discriminatory reason for his firing. As we have found earlier, Hard Rock has done so. The same evidence Dunston proffered in his *prima facie* case of race discrimination is equally sufficient to meet his burden to show pretext for retaliation. Dunston has shown that he was terminated for using force while a Caucasian officer was not disciplined for engaging in similar conduct. After Dunston complained about the different treatment he received, he was terminated the next day. A reasonable jury could find Dunston's version credible and conclude that he was terminated in retaliation for his complaints of race discrimination.

## *Hostile Work Environment*

To succeed on a hostile work environment claim under Title VII, the plaintiff must establish that: (1) he suffered intentional discrimination because of his protected status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (citations omitted).

Title VII prohibits conduct that would "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993). To determine whether the work environment is hostile, the factfinder considers the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

A hostile work environment exists when the workplace is both objectively and subjectively hostile. *Id.* at 21–22. It is not enough that "the employee subjectively perceives [the environment] as abusive or hostile[.]" *Ullrich v. U.S. Sec'y of Veterans Affairs,* 457 F. App'x 132, 140 (3d Cir. 2012). The environment must also be "objectively hostile or abusive," one "a reasonable person would find hostile or abusive." *Id.* (quoting *Harris*, 510 U.S. at 21).

Dunston makes numerous unsubstantiated claims about how Caucasian security officers were treated more favorably at Hard Rock, creating an atmosphere of race discrimination. He testified that Abercrombie assigned him to draft reports and frequently returned his reports with edits more often than he did with the Caucasian supervisors.[66] He claimed that he was tasked with escorting terminated employees out of the building, assigned celebrity details and forced to work on his days off more often than Caucasian supervisors.[67] He claims that he was given a verbal warning for being late while two Caucasian supervisors were frequently late and never disciplined.[68] He claims those same officers consistently failed to respond to radio calls, whereas he was told to always answer his radio, even if he was assigned to a different area of the casino.[69]

---

[66] Dunston Dep. Tr. at 68:1-69:18, 70:15-71:4, 169:10-170:5.

[67] *Id.* at 74:20-75:13, 183:18-184:11, 185:8-21, 188:13-189:15.

[68] *Id.* at 170:13-171:4, 172:17-175:8; Pl.'s Opp. Exh. F at 5.

[69] Dunston Dep. Tr. at 182:16-23.

Dunston contends several Caucasian security supervisors often congregated in the security manager's office doing nothing without being criticized or disciplined; but when he tried to enter the office, he was told to leave because there were too many officers in the space.[70] Dunston alleges that another security officer told him that a Caucasian security supervisor instructed him to follow around an African American security officer and take pictures of him in moments when he appeared not to be working.[71]

Hard Rock argues the allocation of work assignments and expectations for Dunston during his employment do not amount to a hostile work environment.[72] According to Hard Rock, Dunston cannot show that any of its directions or requests of Dunston were motivated by race.[73] It contends all of the instances of disparate treatment he complains of were part of his job.[74] Dunston argues the disparate treatment he experienced throughout his employment was "harassing conduct" that created "an atmosphere of hostility that permeated the workplace."[75]

Dunston has not established an objectively hostile work environment. Although he may believe that he had a heavier workload than his Caucasian colleagues, he has introduced no evidence beyond speculation and hearsay to corroborate his subjective

---

[70] *Id.* at 179:3-16; Pl's Opp. Exh. F at 6.

[71] Dunston Dep. Tr. at 176:24-177:16, 178:6-26; Pl.'s Opp. Exh. F at 5.

[72] Def.'s Mot. for Summ. J. at 11.

[73] *Id.* at 13.

[74] *Id.*

[75] Pl.'s Opp. at 18.

19

beliefs of disparate treatment in terms of work duties or assignments. He was assigned tasks that were part of his job as a security supervisor. He was not assigned tasks that were above or below his paygrade or beyond his expertise. In fact, the evidence suggests he was assigned certain tasks, like celebrity escorts and drafting incident reports, because of his experience, knowledge of the property, and overall competence.[76] There is no evidence suggesting these assignments affected his job performance, discouraged him from remaining at Hard Rock or prevented his advancement. There is no evidence that these assignments were racially motivated, or that the Caucasian supervisors were treated any differently. Dunston may have believed these assignments created a hostile work environment, but there is no evidence from which a reasonable person in his position would perceive the environment as hostile or abusive. *Harris*, 510 U.S. at 22 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Indeed, he wanted to work at Hard Rock. He sought review of his termination.

Because no reasonable jury could conclude from the totality of the circumstances that Dunston suffered a hostile work environment, we shall grant the motion for summary judgment on this claim.

## Conclusion

There are genuine issues of material fact bearing on whether Dunston's termination was the result of race discrimination and retaliation under Title VII, Section 1981 and NJLAD. Dunston has not established a *prima facie* case for a claim of hostile work environment. Therefore, we shall deny Hard Rock's motion for summary judgment in part and grant it in part.

---

[76] Abercrombie Dep. Tr. at 63:6-64:2, 65:14-66:3.